2022 CO 46 In Re State of Colorado, ex rel. Philip J. Weiser, Attorney General, Plaintiff v. JUUL Labs, Inc.; Adam Bowen; James Monsees; Nicholas Pritzker; and Riaz Valani, Defendants Nos. 22SA108, 22SA111
Supreme Court of Colorado
September 26, 2022

 ADVANCE
 SHEET HEADNOTE

 In this
 case, the supreme court reviews the district court's
 order denying defendants Adam Bo wen, James Monsees, Nicholas
 Pritzker, and Riaz Valani's motions to dismiss for lack
 of personal jurisdiction. Defendants are California residents
 who served in various capacities as officers or directors of
 JUUL Labs, Inc., an e-cigarette manufacturer, or its
 predecessor companies.

 The
 court now concludes that that because (1) the district court
 based its determination on allegations directed against JUUL
 and the group of defendants as a whole, rather than on an
 individualized assessment of each defendant's actions,
 and (2) the State did not allege sufficient facts to
 establish either that defendants were primary participants in
 wrongful conduct that they purposefully directed at Colorado,
 or that the injuries alleged in the amended complaint arose
 out of or related to defendants' Colorado-directed
 activities, the district court erred

 in finding that the State had made a prima facie showing of
 personal jurisdiction in this matter.

 The
 court thus makes the rule to show cause absolute, and remands
 this case for further proceedings consistent with this
 opinion.

 Original Proceedings Pursuant to C.A.R. 21 District Court,
 City and County of Denver, Case No. 20CV32283 Honorable J.
 Eric Elliff, Judge

 Attorneys for Plaintiff:

 Philip
 J. Weiser, Attorney General

 Eric
 R. Olson, Solicitor General

 Abigail M. Hinchcliff, First Assistant Attorney General

 Megan
 Paris Rundlet, Senior Assistant Solicitor General

 Bianca
 E. Miyata, Assistant Solicitor General

 Jeffrey M. Leake, Senior Assistant Attorney General

 Brady
 J. Grassmeyer, Assistant Attorney General

 Attorneys for Defendants Adam Bowen, James Monsees, Nicholas
 Pritzker, and Riaz Valani:

 Stinson LLP

 Zane
 A. Gilmer

 Perry
 L. Glantz

 Attorneys for Defendant Adam Bowen:

 Boersch & Illovsky LLP

 Eugene
 Illovsky Sharon Frase

 Attorneys for Defendant James Monsees:

 Orrick, Herrington & Sutcliffe LLP

 James
 N. Kramer

 Lauren
 B. Seaton

 Attorneys for Defendant

 Nicholas Pritzker and Riaz Valani:

 Kellogg Hansen Todd Figel & Frederick, P.L.L.C.

 Mark
 C. Hansen

 Michael J. Guzman

 David
 L. Schwarz

 Attorneys for Amicus Curiae Colorado Trial Lawyers
 Association:

 Wahlberg, Woodruff, Nimmo & Sloane LLP

 Megan
 K. Matthews

 Balaban Law, LLC

 Olga
 Y. Steinreich

 No
 appearance on behalf of JUUL Labs, Inc.

 Rule
 Made Absolute

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE
 HOOD, JUSTICE HART, and JUSTICE SAMOUR joined. JUSTICE
 BERKENKOTTER did not participate.

 GABRIEL, JUSTICE

 ¶1
 In these original proceedings pursuant to C.A.R. 21, we
 review the district court's order denying Adam Bowen,
 James Monsees, Nicholas Pritzker, and Riaz Valani's
 (collectively, "defendants'") motions to
 dismiss for lack of personal jurisdiction. Defendants are
 California residents who served in various capacities as
 officers or directors of JUUL Labs, Inc. ("JUUL"),
 an e-cigarette manufacturer, or its predecessor companies.
The State of Colorado, through Attorney General Philip J.
 Weiser, has filed an amended complaint alleging that
 defendants in their individual capacities, along with JUUL as
 a corporation, violated several provisions of the Colorado
 Consumer Protection Act ("CCPA") and are subject to
 personal jurisdiction in Colorado. Defendants contend that
 the district court's exercise of personal jurisdiction
 over them is improper because they lack the requisite minimum
 contacts with Colorado and the exercise of personal
 jurisdiction over them is unreasonable in the present
 circumstances. JUUL does not argue that the district court
 lacks personal jurisdiction over it.

 ¶2
We issued a rule to show cause and now conclude that because
 (1) the district court based its determination on allegations
 directed against JUUL and the group of defendants as a whole,
 rather than on an individualized assessment of each
 defendant's actions, and (2) the State did not allege
 sufficient facts to establish either that defendants were
 primary participants in wrongful conduct that they

 purposefully directed at Colorado, or that the injuries
 alleged in the amended complaint arose out of or related to
 defendants' Colorado-directed activities, the district
 court erred in finding that the State had made a prima facie
 showing of personal jurisdiction in this matter.

 ¶3
 Accordingly, we make the rule to show cause absolute and
 remand this case for further proceedings consistent with this
 opinion.

 I.
Facts and Procedural History

 ¶4
 Because this case comes to us in the context of a motion to
 dismiss that the district court resolved based on the
 allegations of the amended complaint alone, we take the facts
 principally from the amended complaint.

 ¶5
 JUUL produces and markets under the JUUL name an electronic
 nicotine delivery system commonly referred to as an
 e-cigarette or vaporizer. The JUUL e-cigarette delivers
 nicotine in self-contained pods that are used in conjunction
 with a rechargeable handheld device that resembles a USB
 flash drive. It appears undisputed that JUUL's
 e-cigarettes and pods are available for purchase online and
 in retail locations throughout the United States.

 ¶6
 JUUL traces its origins back to 2007, when Bowen and Monsees
 founded Ploom, Inc., a company that developed and sold
 pod-based tobacco vaporizers. Bowen served as Ploom's
 Chief Technology Officer, and Monsees served as its

 Chief Executive Officer ("CEO"). In 2015, Bowen and
 Monsees sold Ploom and started Pax Labs, Inc., where they
 first launched the JUUL product.

 ¶7
 In October of 2015, Monsees, who was then Pax's CEO,
 stepped down and transferred into the role of Chief Product
 Officer. For the next ten months, three board members,
 including Pritzker and Valani, served on an executive
 committee that effectively ran the company's operations
 until the board named a new CEO.

 ¶8
 Thereafter, in 2017, JUUL was spun off as a separate company
 in order to allow it to focus solely on e-cigarettes.

 ¶9
 JUUL has publicly stated that its mission is to transition
 the world's adult smokers away from combustible
 cigarettes, to eliminate the use of such cigarettes, and to
 combat underage usage of JUUL products. In 2018, however, 27%
 of high school students in Colorado reported that they had
 vaped within the last thirty days-a rate almost double that
 of the national rate. And that same year, the commissioner of
 the U.S. Food and Drug Administration ("FDA")
 declared that the United States faced an "epidemic of
 youth-cigarette use."

 ¶10
 Against this backdrop, in July 2020, the State filed a
 complaint against JUUL setting forth two theories of
 liability. First, the State alleged that JUUL had
 "created a public nuisance of youth and adult addiction
 that substantially, significantly and unreasonably interferes
 with the well-being of the Colorado public and its health,
 safety and welfare." Second, the State asserted that
 JUUL

 has engaged in numerous deceptive trade practices, each of
 which constitutes a violation of section 6-1-105(1), C.R.S.
(2022), of the CCPA. In particular, the State alleged, among
 other things, that JUUL had (1) knowingly and recklessly
 advertised the sale of an addictive nicotine product to
 youth; (2) failed to disclose that its product contained
 nicotine and that nicotine is an addictive chemical; (3)
 knowingly, recklessly, and falsely represented the
 concentration and quantity of nicotine in JUUL's
 e-cigarettes; and (4) falsely implied that the primary
 ingredients in JUUL's e-cigarettes were approved for
 inhalation by the FDA.

 ¶11
 Notably, the bulk of the State's complaint focused on
 JUUL's nationwide actions and advertising campaigns,
 including, among other allegations, that JUUL posted
 misleading information on its website regarding the
 ingredients of its products, engaged social media influencers
 and celebrities to market its products to underage consumers,
 and used a private company masquerading as a non-profit
 smoking-cessation organization to generate referrals for JUUL
 products. With regard to Colorado, the complaint alleged
 little more than that in September 2015, JUUL held over sixty
 promotional events at convenience and tobacco store parking
 lots in this state.

 ¶12
 JUUL moved to dismiss the complaint in part, arguing that (1)
the State's public nuisance claim failed under Colorado
 law and (2) certain of the State's CCPA claims were
 preempted by federal law. The district court granted
 JUUL's

motion to dismiss as to the public nuisance claim but denied
 the motion to the extent that it was premised on JUUL's
 preemption arguments.

 ¶13
 Thereafter, the State amended its complaint to add
 defendants, in their individual capacities, as defendants in
 the suit. The amended complaint summarizes the relationships
 between each individual defendant and JUUL as follows:

Defendant Adam Bowen co-founded the company that became JUUL
 with Defendant James Monsees in 2007. At all relevant times
 and up until the present date, Bowen served as the Chief
 Technology Officer and as a member of the Board of Directors
 of JUUL or its predecessors . . . .

Defendant James Monsees co-founded the company that became
 JUUL with Defendant Adam Bowen in 2007. Monsees served as
 Chief Executive Officer of JUUL until October 2015 when he
 transferred into the position of Chief Product Officer of
 JUUL, until he stepped down from that position in
 approximately March 2020. At all relevant times Monsees was a
 member of the Board of Directors of JUUL or its predecessors,
 until he stepped down in approximately March 2020 . . . .

Defendant Nicholas Pritzker invested in JUUL's
 predecessor as early as 2007, and has served on the Pax
 (JUUL's predecessor) or JUUL Board of Directors since at
 least June 2014 to the present date. From at least October
 2015 through August 2016 Pritzker was on the three-member
 Executive Committee of the Board of Directors that took
 managerial control over the company . . . .

Defendant Riaz Valani has been on the Pax (JUUL's
 predecessor) or JUUL Board of Directors since at least May
 2011 and from at least October 2015 through August 2016,
 Valani was on the three-member

Executive Committee of the Board of Directors that took
 managerial control over the company.

 ¶14
 In addition to adding the above information about each
 individual defendant, the State changed over fifty references
 to "JUUL" in the original complaint to "JUUL
 and the Management Defendants" in the amended complaint.

 ¶15
The State further added a section to the amended complaint
 entitled, "Involvement of the Management
 Defendants," in which the State alleges that defendants
"fully participated in JUUL's deceptive trade
 practices" and approved JUUL's "unconscionable
 and unfair marketing to youth," "deceptive
 messaging about the health, safety and testing of its
 product," and "deceptive cessation and modified
 risk marketing." To support these assertions, the State
 included a 2015 email in which JUUL's former Chief
 Operating Officer stated, among other things, "Our board
 members are more involved than most, and likely crazier than
 most, given the depth of experience they have in this
 industry."

 ¶16
 With regard to defendants' personal involvement in
 JUUL's marketing, the State alleges that on March 23,
 2015, defendants attended a board meeting at which they
 viewed and then discussed examples of JUUL's proposed
 initial marketing, including a slide that announced,
 "Influencer Marketing has begun." The State further
 asserts that in response to materials like these, Pritzker
 commented that JUUL's branding "feels too
 young."

 ¶17
 Notwithstanding this relative dearth of specific allegations
 regarding defendants' activities, the State contends that
 defendants personally promoted JUUL's strategy of
 engaging social influencers who were "especially
 persuasive to a younger audience." Specifically, the
 State asserts that when Vanity Fair published a
 photo of an adult celebrity carrying a JUUL device at an
 awards ceremony, Valani asked Bowen how they could make the
 image "go viral" and offered a connection to the
 celebrity's publicist. The State further contends that
 Pritzker emailed Monsees to request that JUUL send free
 products to a member of a popular band, whom JUUL's
 Marketing Director described as "an 'influencer'
 and one of JUUL's greatest 'champions.'"

 ¶18
 With regard to JUUL's allegedly deceptive messaging
 concerning its products' safety, the State contends that
 defendants attended a board meeting at which JUUL's Head
 of Scientific and Regulatory Affairs made clear that JUUL was
 putting off certain toxicology testing. The State asserts
 that in spite of defendants' awareness that JUUL had not
 fully tested its products for harmful and potentially harmful
 constituents, Bowen provided deceptive assurances about
 JUUL's safety to a JUUL sales representative who had been
 working to allay concerns expressed by Kroger, a national
 grocery chain. The State alleges that, in reliance on these
 assurances, Kroger sold JUUL products in its Colorado stores
 from 2016 until 2019.

 ¶19
 Lastly, the State alleges that defendants' communications
 showed a focus on "debunking studies, and responding to
 negative press, rather than engaging in substantive changes
 or youth prevention in a timely fashion." The amended
 complaint thus quotes an email from Valani to JUUL's
 board and CEO, in which he requested weekly progress updates
 on, among other things, JUUL's efforts to "[d]ebunk
 the studies . . ., ideally in coordination with independent
 researchers"; "[a]nnounce that [JUUL] agree[s] that
 youth should not use [tobacco products]"; and hire a
 "credible head" of youth policy. The amended
 complaint further details how Valani emailed a New York
 Times article entitled, "The Formaldehyde in Your
 E-Cigs," to JUUL's CEO and defendants, prompting the
 CEO to ask the group about the level of formaldehyde in
 JUUL's products. Monsees responded that the level of
 formaldehyde in JUUL's e-cigarettes was "[m]uch
 lower in e-cigs in general compared to cigs" and
 "[n]early undetectable in JUUL." The State also
 alleges that in a letter to the editor published by the
 Denver Post, JUUL's CEO wrote, "[T]he fact
 that [JUUL] has taken off with youth is as appalling to us as
 it is to you." Commenting on this letter in an internal
 email, Valani responded, "Thanks. Great to see."

 ¶20
 Notably, none of the foregoing allegations show any direct
 connection between defendants and the state of Colorado. Nor
 do any of these allegations suggest that any of defendants
 purposefully aimed their activities at Colorado, as

 opposed to engaging in nationwide marketing activities.
Indeed, despite the fact that the amended complaint is 141
 pages long, its only allegations specifically concerning
 Colorado (i.e., allegations beyond those related to
 nationwide advertising) were that (1) JUUL held sampling
 events and sold JUUL products in Colorado stores (none of the
 Management Defendants were alleged to have attended any of
 these sampling events, which were part of a broader campaign
 and not unique to Colorado); (2) "youthful images"
 from JUUL's board-approved marketing plan were shown in
 marketing displays in Colorado convenience stores, and brand
 ambassadors who attended the sampling events were instructed
 to direct consumers to JUUL's website if they had any
 health- or safety-related questions (these, too, were not
 unique to Colorado); and (3) JUUL's CEO (not any of
 defendants) authored a letter to the editor that was
 published in the Denver Post.

 ¶21
 In response to the State's new allegations, Bowen and
 Monsees (separately) and Pritzker and Valani (together) filed
 motions to dismiss the amended complaint. All defendants, who
 as noted above are California residents, asserted that the
 district court did not have personal jurisdiction over them.
To support this assertion, each defendant contended that the
 State failed to plead facts sufficient to make a prima facie
 showing that defendants had established "minimum
 contacts" with Colorado, as required under
 International Shoe Co. v. Washington, 326 U.S. 310,
 316 (1945), and its progeny. Specifically, defendants

 argued that under Calder v. Jones, 465 U.S. 783,
 789-90 (1984), and Rome v. Reyes, 2017 COA 84,
 ¶ 32, 401 P.3d 75, 83, a court may exercise personal
 jurisdiction over the directors of a corporation only when
 those directors were "primary participants" in the
 alleged corporate wrongdoing and "expressly aimed"
 their activities at the forum state. Here, however,
 defendants contended that the amended complaint did not
 allege that any of them was a primary participant in any acts
 directed at Colorado. Specifically, defendants asserted that
 the amended complaint did not allege that any of them spoke
 directly with any Colorado residents, signed agreements for
 work to be performed in Colorado, or otherwise personally
 participated in any Colorado-based projects or transactions.
Defendants thus argued that the amended complaint did not
 show that they had expressly aimed any activity at Colorado.
To the contrary, they said that, at best, the amended
 complaint described "undirected, national conduct,"
 which was insufficient to establish personal jurisdiction
 over them.

 ¶22
 Pritzker and Valani further took issue with the State's
 referring to them as "Management Directors,"
 arguing that they had never held management positions at
 JUUL. Accordingly, throughout their briefing, Pritzker and
 Valani referred to themselves as "Non-Management
 Directors" and asserted that the allegations in the
 amended complaint were impermissibly "conclusory and
 group-pled."

 ¶23
 Finally, all defendants contended that even if the State
 could somehow show that they had minimum contacts with
 Colorado, the court's exercise of personal jurisdiction
 over them as California residents would be unreasonable and
 thus unconstitutional in the present circumstances.

 ¶24
 Without holding an evidentiary hearing, the district court
 issued an order denying defendants' motions to dismiss.
In this order, the court acknowledged that "in its
 145 [sic] pages, nowhere does the [amended
 complaint] attempt to describe the individual defendants'
 connections to Colorado." (Emphasis added.)
Nevertheless, the court reasoned that although the amended
 complaint "is short on specifics regarding the action of
 any one of the individual defendants, it is quite specific
 regarding the actions of the group of them." The court
 thus rejected defendants' arguments that the State had
 failed to make a prima facie showing of personal
 jurisdiction, explaining, "The individuals are alleged
 to have conceived, sanctioned, or approved [JUUL's]
 course of conduct in the commission of the alleged actions.
As such, they are potentially liable as individuals. And
 having potentially committed torts in Colorado, they are
 subject to the state's long arm statute." (Citation
 omitted.) For the same reasons, the court rejected
 defendants' arguments that it would be unreasonable to
 subject them to personal jurisdiction in Colorado.

 ¶25
 Bowen and Monsees (separately) and Pritzker and Valani
 (together) then moved to certify an interlocutory appeal to
 the court of appeals pursuant to C.A.R. 4.2, but the district
 court denied those motions.

 ¶26
 Thereafter, Bowen and Monsees (this time together) and
 Pritzker and Valani (again together) filed petitions under
 C.A.R. 21 seeking immediate relief from the district
 court's order denying their motions to dismiss for lack
 of personal jurisdiction. In these petitions, defendants
 argued that the district court had erred in concluding that
 it could properly assert personal jurisdiction over them
 because (1) the State had failed to allege that defendants
 were primary participants in any wrongdoing expressly aimed
 at Colorado, (2) defendants lacked minimum contacts with
 Colorado, and (3) the exercise of jurisdiction over them
 would therefore be unreasonable. We issued rules to show
 cause in each case. Because defendants raise substantively
 overlapping issues and arguments, we now resolve the two
 cases together.

 II.
Analysis

 ¶27
We begin by discussing our jurisdiction to hear this matter
 pursuant to C.A.R. 21. Next, we lay out the pertinent
 principles of law, including the procedure for addressing
 C.R.C.P. 12(b)(2) motions, the applicable standard of review,
 and controlling precedent regarding personal jurisdiction. We
 then apply these principles to the facts before us and
 conclude that the allegations in the

 amended complaint are insufficient to establish a prima facie
 showing of personal jurisdiction over the individual
 defendants here. Accordingly, we need not consider whether
 the district court's exercise of jurisdiction over
 defendants would be unreasonable.

 A.
Original Jurisdiction

 ¶28
 Whether to exercise original jurisdiction under C.A.R. 21 is
 a matter within our sole discretion. People v.
 Tafoya, 2019 CO 13, ¶ 13, 434 P.3d 1193, 1195.
"An original proceeding under C.A.R. 21 is an
 extraordinary remedy that is limited both in its purpose and
 availability." Id. We generally choose to
 exercise our discretion under C.A.R. 21 in "cases that
 raise issues of first impression and that are of significant
 public importance." Smith v. Jeppsen, 2012 CO
 32, ¶ 6, 277 P.3d 224, 226. Further, as pertinent here,
 "We often elect to hear challenges to 'the exercise
 of personal jurisdiction by district courts over out-of-state
 defendants' because they 'raise[ ] the question
 whether it is unfair to force such a party to defend here at
 all.'" Magill v. Ford Motor Co., 2016 CO
 57, ¶ 9, 379 P.3d 1033, 1036 (alteration in original)
(quoting Keefe v. Kirschenbaum & Kirschenbaum,
 P.C., 40 P.3d 1267, 1270 (Colo. 2002)).

 ¶29
 For three principal reasons we deem it appropriate to
 exercise our discretion under C.A.R. 21 to hear this matter.
First, we have not yet opined on the degree of participation
 corporate directors must have in a corporation's alleged

 wrongdoing to subject those directors in their individual
 capacities to personal jurisdiction in Colorado. Second, we
 view this issue as one of significant public importance
 because it not only concerns the rights of the parties in
 this case but also affects whether non-resident directors of
 any entity may be haled into court in Colorado. And third,
 were we to decline to hear this matter pursuant to C.A.R. 21,
 defendants would be forced to litigate their case in Colorado
 and would be able to seek relief only after they have
 shouldered the very burden that they now challenge as
 improper.

 B.
 C.R.C.P. 12(b)(2) Motions and Standard of Review

 ¶30
 Courts have the discretion to address pre-trial motions filed
 pursuant to C.R.C.P. 12(b)(2) either by considering only the
 documentary evidence in the case or by holding a hearing.
Archangel Diamond Corp. v. Lukoil, 123 P.3d 1187,
 1192 (Colo. 2005). The documentary evidence consists of the
 allegations made in the complaint and any affidavits and
 other evidence submitted by the parties. Id. When,
 as here, the trial court addresses a C.R.C.P. 12(b)(2) motion
 based on the documentary evidence alone, the trial court must
 accept as true allegations in the complaint that are not
 contradicted by the defendants' competent evidence and
 must resolve any conflicting facts in the plaintiff's
 favor. Id.

 ¶31
 Further, when a court chooses to decide a C.R.C.P. 12(b)(2)
 motion based solely on the documentary evidence, "the
 plaintiff need only demonstrate a prima

 facie showing of personal jurisdiction to defeat the
 motion." Id. This burden is not high-a prima
 facie showing exists "when the plaintiff raises a
 reasonable inference that the court has jurisdiction over the
 defendant." Rome, ¶ 10, 401 P.3d at 79-80;
see also Archangel, 123 P.3d at 1192 (describing as
 "light" the burden of making a prima facie
 showing).

 ¶32
 Whether a plaintiff has made a prima facie showing of
 personal jurisdiction is a question of law that we review de
 novo. Magill, ¶ 11, 379 P.3d at 1036.

 C.
Personal Jurisdiction

 ¶33
"For a Colorado court to exercise jurisdiction over a
 non-resident defendant, the court must comply with
 Colorado's long-arm statute and constitutional due
 process." Align Corp. v. Boustred, 2017 CO 103,
 ¶ 9, 421 P.3d 163, 167. Because Colorado's long-arm
 statute confers on courts "the maximum jurisdiction
 permitted by the due process clauses of the United States and
 Colorado constitutions," a plaintiff's ability to
 establish jurisdiction over a non-resident defendant
 necessarily depends on whether a Colorado court's
 exercise of that jurisdiction comports with due process.
Id. (quoting Archangel, 123 P.3d at 1193).

 ¶34
 In determining whether a court may exercise personal
 jurisdiction over the defendants in a multi-defendant case,
 courts must consider each defendant individually. Thus, in
 Rush v. Savchuk, 444 U.S. 320, 331-32 (1980), the
 Supreme Court concluded that "considering the
 'defending parties' together and

 aggregating their forum contacts in determining whether [the
 district court] had jurisdiction . . . is plainly
 unconstitutional." Likewise, in Calder, 465
 U.S. at 790, the Court opined that employees' contacts
 with the forum state "are not to be judged according to
 their employer's activities there," but rather
 "[e]ach defendant's contacts with the forum State
 must be assessed individually." And in Burger King
 Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985), the Court
 emphasized that personal jurisdiction is proper only when
 "actions by the defendant himself . . . create
 a 'substantial connection' with the forum
 State." (Quoting McGee v. Int'l Life Ins.
 Co., 355 U.S. 220, 223 (1957).)

 ¶35
 In International Shoe, 326 U.S. at 316, the Supreme
 Court concluded that a state may exercise personal
 jurisdiction over a non-resident defendant only when that
 defendant has "certain minimum contacts with [the forum
 state] such that the maintenance of the suit does not offend
 'traditional notions of fair play and substantial
 justice.'" (Quoting Milliken v. Meyer, 311
 U.S. 457, 463 (1940).) In assessing whether a defendant has
 minimum contacts with the forum state, "a court properly
 focuses on 'the relationship among the defendant, the
 forum, and the litigation.'" Calder, 465
 U.S. at 788 (quoting Shaffer v. Heitner, 433 U.S.
 186, 204 (1977)). Thus, "[f]or a State to exercise
 jurisdiction consistent with due process, the defendant's
 suit-related conduct must create a substantial connection
 with the forum State." Walden v. Fiore, 571
 U.S. 277, 284 (2014).

 ¶36
 This relationship-based approach to questions of personal
 jurisdiction has given rise to two distinct categories of
 jurisdiction, namely, general jurisdiction and specific
 jurisdiction. Magill, ¶ 15, 379 P.3d at 1037.
Here, the State does not allege that general jurisdiction
 exists with respect to the directors at issue. Accordingly,
 we turn to the applicable law governing the exercise of
 specific jurisdiction.

 ¶37
 For purposes of specific jurisdiction, the Supreme Court has
 instructed that to meet the minimum contacts standard, a
 non-resident defendant must have "purposefully
 directed" its activities at residents of the forum state
 and the plaintiff's injuries must "arise out of or
 relate to" the defendant's forum-related activities.
Burger King, 471 U.S. at 472 (first quoting
 Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774
(1984); and then quoting Helicopteros Nacionales de
 Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984));
accord Eighteen Seventy, LP v. Jayson, 32 F.4th 956,
 966 (10th Cir. 2022). Courts have applied a variety of tests
 to determine whether a defendant's actions satisfy the
 above-referenced "purposeful direction" standard.
For example, in Old Republic Insurance Co. v. Continental
 Motors, Inc., 877 F.3d 895, 905 (10th Cir. 2017), the
 court discussed the "continuing relationships,"
"market exploitation," and "harmful
 effects" frameworks for determining whether a
 non-resident defendant's activities satisfy the
 purposeful

 direction requirement. Here, the State argues that
 defendants' actions reflect "purposeful
 direction" under both the effects and market
 exploitation tests.

 ¶38
 The effects test derives from the Supreme Court's opinion
 in Calder, 465 U.S. at 785-90. There, a celebrity
 who resided in California brought a libel suit in a
 California court against the president of the National
 Enquirer and a reporter who worked for that publication,
 both of whom resided in Florida. Id. at 785-86. The
 Court ultimately concluded that jurisdiction in California
 was proper because defendants were "primary
 participants" in wrongful conduct that they
"expressly aimed" at California. Id. at
 789-90.

 ¶39
We subsequently employed a Calder-derived analysis
 in Archangel, 123 P.3d at 1199-1200. Specifically,
 we applied the articulation of the effects test that the
 Tenth Circuit had adopted in Far West Capital, Inc. v.
 Towne, 46 F.3d 1071, 1079 (10th Cir. 1995). See
Archangel, 123 P.3d at 1199-1200. In Far West
 Capital, 46 F.3d at 1079, the court required "a
 particularized inquiry as to the extent to which the
 defendant has purposefully availed itself of the benefits of
 the forum's laws."

 ¶40
 In the time since we decided Archangel, the Tenth
 Circuit has further distilled the effects test into three
 elements: "(1) an intentional action; (2) expressly
 aimed at the forum state; and (3) . . . knowledge that the
 brunt of the injury would be felt in the forum state."
Eighteen Seventy, 32 F.4th at 967 (quoting
Dental Dynamics, LLC v. Jolly Dental Grp., LLC, 946
 F.3d 1223, 1231 (10th Cir. 2020)). Under

 this version of the test, the party asserting jurisdiction
 (here, the State) must establish each of the three elements
 to demonstrate purposeful direction. Id. Because (1)
 the Tenth Circuit's recitation of the effects test in
 Eighteen Seventy is consistent with our
 understanding of Calder and general due process
 requirements and (2) all of the parties before us appear to
 rely on this version of the test, we likewise will apply this
 version of the effects test to the facts before us.

 ¶41
 The market exploitation test, in turn, derives from the
 Supreme Court's decision in Keeton, 465 U.S. at
 774, 781. There, the Supreme Court concluded that a
 non-resident publisher's "regular monthly sales of
 thousands of magazines" in New Hampshire satisfied the
 purposeful direction requirement of the minimum contacts
 analysis. Id. at 774. In so concluding, the Court
 explained that when a defendant "has continuously and
 deliberately exploited the New Hampshire market, it must
 reasonably anticipate being haled into court there in a libel
 action based on the contents of its magazine."
Id. at 781. Accordingly, under the market
 exploitation test, "a defendant purposefully directs
 activities into the forum State if it continuously and
 deliberately exploits the forum State's market."
XMission, L.C. v. Fluent LLC, 955 F.3d 833,
 849 (10th Cir. 2020). Factors suggesting purposeful direction
 based on forum state market exploitation include "high
 sales volume and large customer base and revenues" and
 "extensive nationwide advertising or ads targeting the
 forum state." Old Republic, 877 F.3d at 915.

 ¶42
The parties here dispute whether the market exploitation
 framework is available to the State as a means of
 demonstrating that defendants (as opposed to JUUL) satisfy
 the "purposeful direction" component of the minimum
 contacts analysis. The State contends that "if an
 individual is directly involved in unlawful acts that he
 knows will reach the forum state through his company's
 continuous and deliberate exploitation of the forum market,
 he can expect to answer for his acts in the forum
 state." Defendants, in contrast, argue that the market
 exploitation test does not apply to individual corporate
 directors but rather to the corporate entity, which is the
 true market participant. We agree with defendants.

 ¶43
 In Old Republic, 877 F.3d at 907 n.14, the court
 observed, "In Calder, the Court could not rely
 on the market exploitation basis for personal jurisdiction
 because, unlike in Keeton, the plaintiff sued the
 reporter and the editor who worked on the allegedly
 defamatory article rather than their corporate
 employer." Such a ruling suggests that the market
 exploitation test does not apply to corporate employees but
 only to the corporate entity itself. Indeed, the State does
 not cite, and we have not found, a published decision in
 which a court subjected a corporate director, rather than the
 corporation itself, to jurisdiction under the market
 exploitation framework. And this is unsurprising. Although
 courts can readily attribute factors such as sales volume, a
 customer base, and revenues to corporate entities, these
 factors are not readily attributable to individual directors.

 ¶44
 Even were we to conclude that the market exploitation test
 could theoretically apply to directors in their individual
 capacities, however, at no point does the State allege that
 any of defendants here had the continuous contacts with
 Colorado necessary to succeed under that framework. See
XMission, 955 F.3d at 849. Accordingly, we will apply
 the "effects test" rather than the "market
 exploitation test" to determine whether Colorado courts
 may exercise personal jurisdiction over defendants here.

 ¶45
 Finally, if a court determines that a non-resident defendant
 has the requisite minimum contacts with the forum state, then
 "these contacts may be considered in light of other
 factors to determine whether the assertion of personal
 jurisdiction would comport with 'fair play and
 substantial justice.'" Align, ¶ 13,
 421 P.3d at 168 (quoting Keefe, 40 P.3d at 1271). In
 making this determination, we may consider "the burden
 on the defendant, the forum state's interest in resolving
 the controversy, and the plaintiff's interest in
 attaining effective and convenient relief."
Archangel, 123 P.3d at 1195.

 ¶46
 Having thus set forth the applicable law, we now turn to the
 specific issues presented in this case.

 D.
Application

 ¶47
 As noted above, to establish personal jurisdiction under the
 effects test, the party asserting jurisdiction must show
 "(1) an intentional action; (2) expressly

 aimed at the forum state; and (3) . . . knowledge that the
 brunt of the injury would be felt in the forum state."
Eighteen Seventy, 32 F.4th at 967 (quoting
Dental Dynamics, 946 F.3d at 1231). For several
 reasons, we conclude that the State has not carried this
 burden here.

 ¶48
 First, the State seeks to establish personal jurisdiction by
 aggregating forum contacts. This, however, is directly
 contrary to Supreme Court precedent forbidding precisely this
 type of pleading to establish personal jurisdiction. See
Rush, 444 U.S. at 331-32. Indeed, the district court
 essentially conceded that it was relying on such aggregated
 contacts.

 ¶49
 Specifically, the district court framed the issue before it
 as "whether [JUUL's] actions, as alleged, are
 sufficient to assert long arm jurisdiction over the
 individual movants, all of whom are or were officers and/or
 directors of [JUUL] during the relevant time." The court
 then reviewed the allegations in the amended complaint and
 noted, "While the [amended complaint] is short on
 specifics regarding the action of any one of the individual
 defendants, it is quite specific regarding the actions of the
 group of them." After considering allegations related to
 "group action," citing to Hoang v. Arbess,
 80 P.3d 863 (Colo.App. 2003), and observing that
 "separating out the individual defendants" may not
 be "practical or possible for pleading purposes,"
the court concluded that the alleged "group action"
 conferred personal jurisdiction over each individual
 defendant.

 ¶50
Hoang, however, does not support the district
 court's conclusion. There, a division of the court of
 appeals explained:

While an officer of a corporation cannot be held personally
 liable for a corporation's tort solely by reason of
 his or her official capacity, an officer may be held
 personally liable for his or her individual acts of
 negligence even though committed on behalf of the
 corporation, which is also held liable.

Id. at 867 (emphasis added).

 ¶51
 As an initial matter, we note that the division in
 Hoang was addressing whether a corporate
 officer's actions subjected him to liability, not
 personal jurisdiction. Id. at 866. The district
 court then appears to have done the same, apparently
 conflating the issues of director liability and personal
 jurisdiction over a director. Regardless, the district court
 appears to have engaged in the very reasoning that
 Hoang prohibits, namely, subjecting defendants to
 liability for JUUL's alleged torts based solely on
 defendants' official capacities. Thus, the court
 explained that as "founders, board members, and/or
 Executive Committee members who essentially directed [JUUL]
 activities," each individual defendant was
 "potentially liable" for JUUL's course of
 conduct.

 ¶52
 For the same reason, we are unpersuaded by the State's
 reliance on an email in which JUUL's former Chief
 Operating Officer claimed that, collectively, JUUL's
 board members were "more involved than most, and likely
 crazier than most."

This comment discloses nothing about any individual's
 conduct or how any such conduct was directed toward Colorado.

 ¶53
 And we are not persuaded by the district court's
 assertion that "separating out the individual defendants
[may] not [be] practical or possible for pleading
 purposes." The district court offers no explanation as
 to why this is so, particularly given that the State appears
 to have received discovery in its case against JUUL before it
 filed its amended complaint. Regardless, due process does not
 permit us to curtail a defendant's constitutional
 protections simply because compliance with settled principles
 of law may be difficult.

 ¶54
 Second, at least as to Pritzker and Valani, the State does
 not allege the requisite intentional action to satisfy the
 first prong of the effects test. See Eighteen
 Seventy, 32 F.4th at 967. The effects test applies only
 to "the defendant's suit-related conduct."
Walden, 571 U.S. at 284. Here, many of the
 State's allegations against Pritzker and Valani,
 including its contentions that they had viewed presentations
 announcing that "Influencer Marketing has begun"
 and describing JUUL's toxicology testing, do not describe
 "conduct" at all, much less Colorado-directed
 conduct. Instead, these allegations paint Pritzker and Valani
 as passive recipients of information. The remainder of the
 State's allegations against Pritzker and Valani describe
 only conduct that is highly attenuated from JUUL's
 alleged wrongdoing. For example, in an attempt to demonstrate
 that Pritzker and

 Valani participated in youth marketing, the State points to
 (1) Pritzker's request that JUUL send free products to an
 adult member of a popular band and (2) Valani's
 question regarding how to make a photo of an adult
 celebrity holding a JUUL device "go viral." Lastly,
 in an attempt to establish that Valani participated in the
 allegedly deceptive messaging, the State claims that Valani
 forwarded a New York Times article entitled,
 "The Formaldehyde in Your E-Cigs." The simple acts
 of sending products to an adult consumer, commenting on a
 photo, or forwarding an email do not, however, indicate that
 Pritzker or Valani engaged in JUUL's alleged wrongdoing,
 much less that they engaged in wrongdoing directed at
 Colorado.

 ¶55
 Indeed, many of the facts alleged by the State belie its
 assertions that Pritzker and Valani "approved of,
 directed, actively participated in, or cooperated in . . .
 deceptive and unconscionable marketing." For example,
 Pritzker expressed his concern that JUUL's branding felt
 "too young," and Valani favorably commented on a
 letter to the editor of the Denver Post in which
 JUUL's CEO stated that the company was
 "appalled" that JUUL had taken off with youth.
Valani further requested updates on JUUL's efforts to
 hire a "credible head" of youth policy.
Collectively, these comments tend to show that Pritzker and
 Valani disapproved of (or at least had concerns
 about) JUUL's alleged attempts to target youth and sought
 to engage "credible" sources of information rather
 than

 deceptive ones, thereby undermining the State's effort to
 premise personal jurisdiction on these directors'
 purported approval of, direction, active participation in, or
 cooperation in deceptive marketing.

 ¶56
 Third, the State alleges no facts supporting a conclusion
 that any of defendants expressly aimed their conduct at
 Colorado, as required under the second prong of the effects
 test. Indeed, it appears that the only Colorado-specific
 contacts alleged by the State were that (1) JUUL held
 sampling events and sold JUUL products in Colorado stores;
 (2) "youthful images" from JUUL's
 board-approved marketing plan were shown in marketing
 displays in Colorado convenience stores, and brand
 ambassadors who attended the sampling events were instructed
 to direct consumers to JUUL's website if they had any
 health- or safety-related questions; and (3) JUUL's CEO
 authored a letter to the editor that was published in the
 Denver Post. The State does not allege, however,
 that any of defendants planned or attended the sampling
 events. Nor does the State allege that any of defendants
 drafted the letter (or, for that matter, that the letter
 misrepresented JUUL's products). As a result, the
 district court itself acknowledged that "in its 145
 [sic] pages, nowhere does the [amended complaint] attempt to
 describe the individual defendants' connections to
 Colorado." We agree, and we therefore conclude that the
 allegations in the amended complaint do not satisfy the
 express aiming requirement of the effects test.

 ¶57
 Perhaps recognizing the absence of individualized conduct
 expressly aimed at Colorado, the State contends that an
 individual corporate director's participation in their
 company's nationwide actions satisfies the express aiming
 requirement, at least when the individual knows that the
 company's actions will reach the forum state through the
 company's continuous and deliberate exploitation of the
 forum state's market. Although we have not previously
 addressed this issue directly, a division of our court of
 appeals has done so, and its reasoning is instructive.

 ¶58
 In Giduck v. Niblett, 2014 COA 86, ¶ 20, 408
 P.3d 856, 864, the plaintiff, a Colorado attorney, alleged
 that a group of non-resident defendants had posted defamatory
 statements about him on a website and that these statements
 were subsequently published on other websites, including
 Amazon and Facebook. Id. The plaintiff asserted that
 the defendants knew that he was a Colorado resident and
 member of the Colorado bar and that they agreed to, and did,
 publish false statements about him to harm his reputation as
 a Colorado attorney. Id. Although the plaintiff
 argued that these actions supported jurisdiction over the
 defendants, the division disagreed. Id. at
 ¶¶ 20-21, 408 P.3d at 864. Relying on the Supreme
 Court's conclusion in Walden, 571 U.S. at 290,
 that "[r]egardless of where a plaintiff lives or works,
 an injury is jurisdictionally relevant only insofar as it
 shows that the defendant has formed a contact with the forum
 State," the division determined

 that the defendants' widely distributed statements did
 "not focus on Colorado" and therefore did "not
 provide sufficient minimum contacts to subject defendants to
 personal jurisdiction" here. Giduck, at
 ¶¶ 23-24, 408 P.3d at 865 (quoting Walden,
 571 U.S. at 290).

 ¶59
 This analysis is consistent with recent case law from the
 Tenth Circuit. In Eighteen Seventy, 32 F.4th at
 959-61, for example, two Wyoming entities alleged that
 Jayson, a resident of the United Kingdom, had, through
 misrepresentations and omissions, induced their investments
 in a foreign company of which Jayson was a director and chief
 financial officer. Noting that Jayson had never visited
 Wyoming and that there was "nothing unique about [the
 plaintiff entities], much less Wyoming, that led Mr. Jayson
 to prepare fraudulent materials," the court concluded
 that "the focal point of Mr. Jayson's allegedly
 tortious acts clearly was not Wyoming and, relatedly, that
 any contacts by Mr. Jayson with Wyoming were too attenuated
 to allow a court to exercise jurisdiction over him."
Id. at 975.

 ¶60
 The same is true here. Any actions that defendants took in
 relation to JUUL's nationwide marketing campaign were not
 "expressly aimed" at Colorado. Similar to the
 allegedly defamatory statements in Giduck and the
 fraudulent materials in Eighteen Seventy, defendants
 did not direct JUUL's alleged messaging and materials at
 any particular geographic location. Nor does anything in the
 amended complaint suggest that defendants targeted
 influencers in Colorado,

 prioritized launching JUUL's products in Colorado over
 other states, or tailored any of its materials to appeal to
 Colorado consumers. And although the State alleges that
 Monsees communicated with a JUUL sales representative who in
 turn spoke with a representative of Kroger, which then sold
 JUUL products in its Colorado stores, this interaction
 exemplifies the kind of attenuated contacts that the court in
 Eighteen Seventy, 32 F.4th at 975, concluded did not
 satisfy the express aiming requirement.

 ¶61
 Because the State cannot satisfy the first or second prongs
 of the effects test (i.e., intentional action expressly aimed
 at Colorado), we conclude that the State has not established
 personal jurisdiction over defendants in this case.
Accordingly, we need not reach the third prong of the effects
 test.

 ¶62
We are not persuaded otherwise by the out-of-state cases on
 which the State relies. The State particularly urges us to
 consider two decisions in which the federal district court
 for the Northern District of California concluded that five
 states involved in a multi-district litigation action could
 properly exercise personal jurisdiction over the defendants,
 including the four individual defendants who are now before
 this court. See In re JUUL Labs, Inc. (JUUL
 II), 533 F.Supp.3d 858, 879 (N.D. Cal. 2021) (concluding
 that personal jurisdiction existed over Pritzker and Valani);
In re JUUL Labs, Inc. (JUUL I), 497
 F.Supp.3d 552, 675-77 (N.D. Cal. 2020) (denying Bowen and
 Monsees' motion to dismiss for lack of personal
 jurisdiction

 based on their "involvement in the development and
 implementation of the challenged nationwide marketing
 campaign and its intended effects in the forum states").
Obviously, we are not bound by these district court
 decisions. And in any event, we are not convinced by their
 limited analyses. For example, in JUUL I, the court
 acknowledged the express aiming requirement but then glossed
 over it entirely, focusing instead on JUUL's nationwide
 conduct. JUUL I, 497 F.Supp.3d at 675-77. As set
 forth above, we do not agree that personal jurisdiction over
 corporate directors can be predicated on a corporation's
 nationwide contacts alone.

 ¶63
 In our view, the New York Supreme Court's decision in
 People ex rel. James v. JUUL Labs, Inc., No.
 452168/2019, 2022 WL 2757512, at *3-6 (N.Y. Sup. Ct. July 14,
 2022), which involved the same parties and jurisdictional
 questions as are now before us, is analytically more sound.
There, the court summarized the alleged contacts between the
 defendants and New York, noting the People's allegations
 that (1) Monsees and Bowen were part of a public relations
 strategy that was aimed at New York, and both were scheduled
 to meet with the press and with investors while in New York
 for JUUL's launch; (2) Bowen had sent an email to a
 member of the JUUL marketing team commenting on how to
 increase the number of New Yorkers trying JUUL e-cigarettes;
 (3) while in New York, Valani had sent comments to JUUL
 senior management regarding defaced marketing materials;

(4) Valani had worked with JUUL's marketing team to
 ensure that JUUL products were available at a Met Gala
 afterparty in Manhattan; (5) Monsees, Bowen, Pritzker, and
 Valani had attended board meetings at which New York was
 identified as a focus of the launch campaign; (6) these
 defendants were provided information regarding the success of
 the New York launch; (7) Valani had been involved in meetings
 to discuss a strategy for responding to New York City
 anti-tobacco legislation; and (8) Monsees, Pritzker, and
 Valani had met and communicated with New York investors in
 New York, and this meeting had resulted in an investment by a
 New York-based investment firm. Id. at *3-4.

 ¶64
 The New York court found that the amended complaint in that
 case contained sufficient allegations to establish personal
 jurisdiction over Monsees and Bowen, in part because the two
 men had actively participated in the deceptive marketing
 aimed at teens in New York, including attending the New York
 launch campaign, and thus they had personally transacted
 business in New York. Id. at *5. With regard to
 Pritzker and Valani, however, the court came to the opposite
 conclusion, explaining that although these two defendants
"knew of and approved the marketing of JUUL's
 product, JUUL marketed the product throughout the country and
 not just in New York." Id. at *6. This, the
 court opined, was insufficient to establish that these
 defendants personally transacted business in New York.
Id.

 ¶65
 The factual allegations in the New York case stand in sharp
 contrast to those now before us. Here, the State never
 alleges that JUUL identified Colorado as a priority or that
 defendants visited Colorado for business purposes. Nor does
 it contend that defendants engaged in communications
 regarding the number of Coloradans who have tried JUUL.
Instead, the State contends only that defendants participated
 to some extent in JUUL's nationwide efforts to market its
 product.

 ¶66
We likewise are unpersuaded by the State's and amicus
 curiae's public policy concerns. Specifically, the State
 and its amicus curiae respectively contend that (1) denying
 the existence of personal jurisdiction over defendants here
 would mean "that a defendant does not target Colorado
 if, at the same time, it also targets other states," and
 (2) our decision today will permit non-resident defendants to
 "claim immunity from suit because they have not
 physically set foot in the state." We disagree with both
 of these contentions. A defendant can certainly target
 multiple states simultaneously, and had the record shown that
 these defendants individually targeted Colorado, among other
 states, then our conclusion might have been different.
Moreover, nothing in our decision today suggests that
 non-resident defendants can claim immunity merely because
 "they have not physically set foot" in Colorado. As
 discussed above, the proper inquiry is whether defendants
 expressly aimed any conduct here, and this requirement can,
 in certain circumstances, be satisfied absent any physical
 presence in this state.

And we perceive nothing in our analysis that can reasonably
 be read to immunize these defendants from their alleged
 actions. The State is free to bring suit where defendants are
 subject to personal jurisdiction. We merely conclude that
 these defendants are not subject to personal jurisdiction
 here.

 ¶67
 In contrast to the State's policy arguments, defendants
 contend that, were we to accept the State's assertion
 that conduct need not be specially directed at the forum
 state to satisfy the express aiming requirements, directors
 of a corporation that does business nationwide would
 potentially be subject to personal jurisdiction in every
 state, regardless of their lack of connection to a particular
 forum. As defendants assert, this is simply not the law, and
 adopting such a principle would impose significant costs on
 board service and could dramatically drive up the costs of
 doing business in Colorado (by, for example, substantially
 increasing the premiums for directors and officers liability
 insurance). We cannot perceive how such a result would
 advance any sound public policy of this state.

 ¶68
 For these reasons, we conclude that the State did not plead
 facts sufficient to establish that the individual defendants
 now before us purposefully directed wrongful conduct at
 Colorado or that the injuries alleged in the amended
 complaint arose out of or related to defendants'
 Colorado-directed activities. Accordingly, we further
 conclude that the State did not make the requisite prima
 facie showing of personal jurisdiction over these defendants.

 ¶69
 In light of this determination, we need not address the
 question of whether exercising personal jurisdiction over
 defendants here would be unreasonable.

 III.
Conclusion

 ¶70
 Because (1) the district court based its determination on
 allegations directed against JUUL and the group of defendants
 as a whole, rather than on an individualized assessment of
 each defendant's actions, and (2) the State did not
 allege sufficient facts to establish either that defendants
 were primary participants in wrongful conduct that they
 purposefully directed at Colorado, or that the injuries
 alleged in the amended complaint arose out of or related to
 defendants' Colorado-directed activities, we conclude
 that the district court erred in finding that the State had
 made a prima facie showing of personal jurisdiction in this
 matter.

 ¶71
 Accordingly, we make our rule to show cause absolute and
 remand this case for further proceedings consistent with this
 opinion.