North Carolina ex rel. Stein v. Bowen, 2022 NCBC 64.

STATE OF NORTH CAROLINA

DURHAM COUNTY

STATE OF NORTH CAROLINA, ex rel. JOSHUA H. STEIN, Attorney General,

Plaintiff,

v.

ADAM BOWEN; HOYOUNG HUH; JAMES MONSEES; NICHOLAS PRITZKER; and RIAZ VALANI,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 3727

**ORDER AND OPINION
ON MOTIONS TO DISMISS**

1. In 2019, the State of North Carolina sued JUUL Labs, Inc. and accused the company of targeting children through the design, marketing, and sale of its e-cigarettes. That case resulted in a settlement and consent judgment in which JUUL agreed to modify its marketing practices.

2. This case is the sequel. The State has sued five of JUUL's officers and directors—Defendants Adam Bowen, James Monsees, Hoyoung Huh, Nicholas Pritzker, and Riaz Valani—for allegedly directing, approving, and failing to stop the company's illegal activities. All five Defendants have moved to dismiss the complaint, contending that the Court lacks personal jurisdiction and that the State has failed to state a claim for relief. (*See* ECF Nos. 23, 25, 27.) For the following reasons, the Court concludes that it lacks personal jurisdiction, **GRANTS** the motions to dismiss on that basis, and **DENIES** all other relief as moot.

*North Carolina Department of Justice, by Swain W. Wood, Brian D. Rabinovitz, Jessica Vance Sutton, Sripriya Narasimhan, and Kevin Anderson, for Plaintiff State of North Carolina, ex rel. Joshua H. Stein, Attorney General.*

*Ellis & Winters LLP, by Dixie T. Wells and Scottie Forbes Lee, and Boersch & Illovsky, LLP, by Eugene Illovsky and Kevin Calia, for Defendant Adam Bowen.*

*Ellis & Winters LLP, by Dixie T. Wells and Scottie Forbes Lee, and Orrick, Herrington & Sutcliffe, LLP, by James N. Kramer, Lauren Seaton, Kevin M. Askew, and Sunny Hwang, for Defendant James Monsees.*

*Ellis & Winters LLP, by Dixie T. Wells and Scottie Forbes Lee, and Kellogg, Hansen, Todd, Figel & Frederick, PLLC, by Michael J. Guzman, Mark Hansen, David L. Schwarz, and Derek Reinbold, for Defendants Hoyoung Huh, Nicholas Pritzker, and Riaz Valani.*

Conrad, Judge.

## I.
## BACKGROUND

3. The following background describes the allegations of the complaint, the nature of the State's claims, and the case's procedural posture. It is presented for context and does not contain any findings of fact.

4. An electronic cigarette, or e-cigarette, is just what its name suggests: a handheld, battery-operated device akin to a cigarette. The device works by heating and vaporizing a nicotine-infused liquid solution. A user inhales the vapor—this is known as vaping—through a mouthpiece so that nicotine passes into the lungs and then into the bloodstream. (*See* Compl. ¶¶ 26–29.)

5. Vaping, like smoking, has provoked intense public-policy debates. Underage vaping may be at the top of the list. Data cited in the complaint suggest that vaping by high-school and middle-school students is rampant. In the State's words, there is "a youth e-cigarette epidemic in North Carolina." (*See* Compl. 1, ¶¶ 23, 55, 83.)

6. Who is responsible for this epidemic? The State pins the blame on JUUL and five of its current and former officials. JUUL makes and sells e-cigarettes across the country. Though not based in North Carolina, it has some 3,000 authorized retailers here. Bowen, Monsees, Huh, Pritzker, and Valani have all served on JUUL's board of directors. Bowen was also Chief Technology Officer, and Monsees was Chief Executive Officer and Chief Product Officer. These men, the State alleges, directed JUUL's efforts to create and market e-cigarettes designed to attract young people. (*See, e.g.*, Compl. ¶¶ 9, 40–43, 54.)

7. According to the State, the design of JUUL's e-cigarettes is enticing to children. They look and taste nothing like traditional cigarettes. Some versions of the device look like flash drives or similar gadgets; others light up and mimic a popular video game. Tar and tobacco are out, replaced by more palatable, dessert-like flavors. And additives boost the users' nicotine buzz while easing any throat discomfort they might feel after inhaling. The State alleges that these design features—developed by Bowen and Monsees—make vaping fun, highly addictive, easy to hide, and more appealing to first-time users, especially youth. (*See* Compl. ¶¶ 59–61, 66, 68, 69, 71–77, 79–81.)

8. The State also takes issue with JUUL's marketing. It alleges that JUUL targeted underage users through its "Vaporized" ad campaign, which coincided with the launch of its first product in 2015. The campaign featured bright images, vivid colors, and youthful models—all allegedly reviewed and approved by JUUL's board of directors—using e-cigarettes in various social settings. JUUL's aim was to portray

vaping as cool and alluring, much the same way that tobacco companies portrayed smoking in the twentieth century. (*See* Compl. ¶¶ 87, 90, 91, 93–97.)

9. Unlike those tobacco companies, though, JUUL had access to modern methods of viral messaging. Its ads appeared not only in traditional media (such as Vice magazine and billboards in Times Square) but also on social-media outlets favored by children (such as Instagram). One aspect of the "Vaporized" campaign was to "engage New York and Los Angeles up-and-comers to use and promote the JUUL brand in a series of web-based and event interactions in 2015." JUUL hosted parties for social-media influencers and enlisted them to share pictures and endorsements with followers, many of whom were underage youth. To stoke public interest even more, JUUL began "seeding" free products and swag to influencers and celebrities. When Vanity Fair photographed singer Katy Perry using a "seeded" device, JUUL reposted the celeb's picture on its own Facebook page and Twitter feed. (*See* Compl. ¶¶ 91, 94, 95, 99, 103, 111, 112, 120, 122.)

10. These advertising methods allegedly struck a chord with teens, who began creating their own JUUL-related, social-media content. Tech-savvy teens posted pictures and videos of themselves vaping and used JUUL-themed hashtags—#JUUL, #JUULLife, #JUULNation, etc.—to share the images with peers. Some individuals within JUUL acknowledged and worried that the company's popularity with youth was tied to its social-media presence. A social-media study commissioned by JUUL in 2018 validated those worries, reporting that "Juul Owns Teens." Even so, JUUL's

board of directors allegedly dismissed—or, worse, embraced—the potential that its marketing appealed to teens. (*See* Compl. ¶¶ 54, 104–08, 112, 114–18, 142.)

11. JUUL also did little to stop teens from buying e-cigarettes. Its website lacked effective safeguards at the point of sale. Many teens easily bypassed the simple measures used to verify age and identity. Those who failed the verification screening, despite being underage, were placed on JUUL's e-mail list to receive future marketing. In addition, JUUL chose not to require an adult's signature upon delivery. (*See, e.g.*, Compl. ¶¶ 193–98, 200, 201, 207, 208, 216.)

12. Blowback from regulators led JUUL to revamp its advertising between 2016 and 2018. The State says these efforts were too little, too late. JUUL's first makeover—the "Smoking Evolved" campaign—kept the look of the "Vaporized" ads and used the same social-media outlets. Its second—the "Make the Switch" campaign—went further and ditched young models in favor of older men and women. But by then, the State alleges, JUUL's youth-friendly brand was entrenched on social media. (*See* Compl. ¶¶ 131–34, 138, 147–49.)

13. In addition to targeting youth, JUUL allegedly deceived the public about vaping's potential harms. Its earliest ads did not say that e-cigarettes contain nicotine. More recent ads disclosed the nicotine content as a percentage and equated the amount of nicotine in one e-cigarette pod to the amount in one pack of cigarettes. The State alleges that describing the nicotine content in that fashion was misleading and masked the true potency and addictive nature of e-cigarettes. The State also

alleges that JUUL advertised vaping as a way to quit smoking without the FDA's approval to do so. (*See* Compl. ¶¶ 161, 165, 169, 170, 173, 174, 177–81, 184–86.)

14. JUUL enjoyed immediate financial success. In late 2018, a major cigarette manufacturer acquired a 35% stake in JUUL in exchange for roughly $13 billion. JUUL paid out nearly all of this money to its employees and investors. Bowen, Monsees, Huh, Pritzker, and Valani received cash distributions ranging from about $500 million to about $2.5 billion. (*See* Compl. ¶¶ 226–28, 231, 233–37.)

15. In 2019, the State sued JUUL based on its allegedly deceptive and youth-oriented marketing. Two years later, the State and JUUL settled their dispute through a consent judgment, which required JUUL to make a cash payment and to modify its marketing practices. Although the State released its claims against JUUL, it did not release potential claims against the five Defendants in this case. (*See generally* Defs.' Jt. Exs. A, B, ECF Nos. 22.1, 22.2.)

16. A few months after entry of the consent judgment, the State brought this suit. It claims that "in the course of supervising and directing the marketing of JUUL's e-cigarette devices and flavored nicotine inserts," Bowen, Monsees, Huh, Pritzker, and Valani "engaged in unfair or deceptive trade practices" under N.C.G.S. § 75-1.1. The alleged unfair or deceptive acts include marketing to underage consumers, deceiving consumers about the nicotine potency of JUUL's products, and falsely claiming that JUUL's products are approved by the FDA as smoking-cessation devices. (*See* Compl. 95–96.)

17.    Three motions to dismiss are pending: one by Bowen, another by Monsees, and a third jointly by Huh, Pritzker, and Valani.  (*See* ECF Nos. 23, 25, 27.)  Each Defendant contests personal jurisdiction and contends that the State has failed to state a claim for relief.  The motions are fully briefed, and the Court held a hearing on 27 June 2022, at which all parties were represented by counsel.  The motions are ripe for determination.

## II.
## PERSONAL JURISDICTION

18.    "Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication."  *In re A.B.D.*, 173 N.C. App. 77, 83 (2005) (citation and quotation marks omitted).  It is a threshold issue that the Court must decide before considering the merits.

19.    A defendant may contest personal jurisdiction by challenging the sufficiency of jurisdictional allegations in the complaint or by offering evidence to refute those allegations.  Here, all five Defendants have submitted affidavits to show that they have either no contacts or insubstantial contacts with North Carolina.  (*See* Bowen Aff., ECF No. 28.2; Monsees Aff., ECF No. 26.2; Huh Aff., ECF No. 24.2; Pritzker Aff., ECF No. 24.3; Valani Decl., ECF No. 24.4.)  In response, the State has submitted twenty-five exhibits of its own.  (*See* Pl.'s Exs. 1–25, ECF No. 78–102.)

20.    "In this context, when the parties have submitted affidavits and exhibits but no evidentiary hearing is held, the trial court must determine the weight and sufficiency of the evidence before it."  *Toshiba Global Com. Sols., Inc. v. Smart & Final Stores LLC*, 381 N.C. 692, 2022-NCSC-81, ¶ 5.  The State, as the plaintiff, bears

the burden to establish personal jurisdiction by a preponderance of the evidence. *See, e.g.*, *Dow-Rein v. Sarle*, 281 N.C. App. 721, 2022-NCCOA-101, ¶ 12; *Parker v. Town of Erwin*, 243 N.C. App. 84, 97 (2015); *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68 (2010).

## A. Legal Principles

21. Determining whether personal jurisdiction exists is a "two-step analysis." *Beem USA LLLP v. Grax Consulting LLC*, 373 N.C. 297, 302 (2020). Jurisdiction must be authorized by North Carolina's long-arm statute, N.C.G.S. § 1-75.4, and be consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Beem USA*, 373 N.C. at 302. In practice, the analysis often collapses into one inquiry because the North Carolina Supreme Court has broadly construed the long-arm statute "to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Id.* (citation and quotation marks omitted); *see also Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676 (1977).

22. Due process requires that a defendant "have certain minimum contacts" with this forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Although courts "have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction," only the latter is at issue. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

23. Specific jurisdiction exists when "the controversy arises out of the defendant's contacts with the forum state." *Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 366 (1986). It "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations*, 564 U.S. at 919 (internal citation and quotation marks omitted). Jurisdiction cannot be based on "a defendant's 'random, fortuitous, or attenuated' contacts with the forum state." *Beem USA*, 373 N.C. at 303 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)). Rather, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Toshiba Global*, 2022-NCSC-81, ¶ 3 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

24. Furthermore, a defendant's status as a corporate officer or director does not, by itself, subject him to jurisdiction wherever the corporation is subject to suit. *See, e.g.*, *Calder v. Jones*, 465 U.S. 783, 790 (1984); *Robbins v. Ingham*, 179 N.C. App. 764, 771 (2006). But neither does it "somehow insulate [him] from jurisdiction." *Calder*, 465 U.S. at 790. The key is that the relationship between the litigation and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum State"—regardless of whether the contacts are made in a personal or official capacity. *Walden*, 571 U.S. at 284 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *see also Padron v. Bentley Marine Grp., LLC*, 262 N.C. App. 610, 616 (2018);

*Saft Am., Inc. v. Plainview Batteries, Inc.*, 189 N.C. App. 579, 596 (2008) (Arrowood, J., dissenting), *rev'd for reasons stated in dissent*, 363 N.C. 5 (per curiam).

25.     *Calder* illustrates this principle.  That case involved a libel suit in California against a national tabloid based in Florida, its president, and one of its reporters. The United States Supreme Court emphasized that the individuals' connections with California were "not to be judged according to their employer's activities" there. *Calder*, 465 U.S. at 790.  Rather, the Court looked to the individuals' own activities, which included intentional actions "expressly aimed at California" with knowledge "that the brunt of [the] injury would be felt" by a California resident.  *Id.* at 789–90. Because the individuals were "primary participants in an alleged wrongdoing intentionally directed at a California resident," the state courts in California had jurisdiction.  *Id.* at 790; *see Walden*, 571 U.S. at 287 (observing that jurisdiction was proper in *Calder* because California was the "focal point" of the defendants' conduct and the plaintiff's injury).  This has become known as the "effects test."  *E.g.*, *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 n.7 (4th Cir. 2003).

## B.  Discussion

26.     In broad strokes, all five Defendants contend that the State's claims do not arise out of contacts that they themselves created with North Carolina.  By affidavit, Huh, Pritzker, and Valani deny having any contacts with North Carolina at all. Bowen and Monsees admit having traveled to North Carolina on a few occasions but deny any other contacts and argue that no claims arise from those visits.  Defendants

contend that the State has impermissibly relied on JUUL's contacts with North Carolina to bridge the gap.

27. The State responds that jurisdiction exists because these individuals participated in JUUL's wrongful conduct, including marketing that targeted underage youth in North Carolina and across the country. Each Defendant, according to the State, had a direct, hands-on role in the design, marketing, and sale of JUUL's products. It is irrelevant, the State contends, that these activities took place outside North Carolina. The State also urges the Court to look past Defendants' affidavits on the ground that evidentiary determinations are "reserved for a later stage of the case." (*E.g.*, Pl.'s Am. Opp'n to Huh, Pritzker, & Valani Mot. Dismiss 11, ECF No. 114 ["Opp'n (HPV)"].)

28. Three things deserve the spotlight at the start. First, the State misunderstands the standard of review. Evidentiary determinations are not reserved for the future. Because each side has offered evidence relating to personal jurisdiction, the time for "determin[ing] the weight and sufficiency of" that evidence is now. *Toshiba Global*, 2022-NCSC-81, ¶ 5.

29. Second, all too often, the State relies on the allegations in its unverified complaint to establish personal jurisdiction.[1] But when "a defendant submits

---

[1] (*See, e.g.*, Pl.'s Am. Opp'n to Bowen Mot. Dismiss 6, ECF No. 113 ["Opp'n (Bowen)"] ("[T]he Complaint is replete with allegations that Bowen—personally—maintained minimum contacts through his work directly managing JUUL and that he purposefully availed himself of the privilege of selling JUUL products in North Carolina."); Pl.'s Am. Opp'n to Monsees Mot. Dismiss 6, ECF No. 112 ["Opp'n (Monsees)"] ("The Complaint contains a surfeit of allegations that Monsees had numerous, substantive contacts with North Carolina . . . .); Opp'n (HPV) 9 ("The allegations in the Complaint show that the Directors' actions in

evidence to counter the allegations in a plaintiff's complaint, those allegations can no longer be taken as true and the plaintiff can no longer rest on the allegations." *Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 278 (2007). Only those allegations that the defendant hasn't contradicted "are accepted as true and deemed controlling." *Inspirational Network, Inc. v. Combs*, 131 N.C. App. 231, 235 (1998); *see also Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 616 (2000).

30. Third, the State's exhibits—over 200 pages of testimony, e-mails, and documents obtained in the earlier lawsuit against JUUL—do not speak for themselves. Yet the State's briefs neither describe the contents of the exhibits nor explain how they support its theory of personal jurisdiction. In fact, its briefs rarely even refer to the exhibits. Each time they do, the reference is to all twenty-five with no citation to any individual document, much less a specific passage or page number.[2] This is not just a violation of Business Court Rule 7.5, which requires "a pinpoint citation to the relevant page of the supporting material whenever possible." It is also an abdication of the State's burden to establish personal jurisdiction by a preponderance of the evidence. *See, e.g.*, *Dow-Rein*, 2022-NCCOA-101, ¶ 12; *Bauer*, 207 N.C. App. at 68.

31. With these observations in mind, the Court concludes that it lacks personal jurisdiction over Defendants. The State has not carried its burden to show that

---

designing, marketing, and selling JUUL e-cigarettes in North Carolina in ways that attracted youth violated North Carolina law.").)

[2] (*See* Opp'n (Bowen) 6, 9 n.4, 14, 17; Opp'n (Monsees) 7 n.3, 12; Opp'n (HPV) 5 n.2, 8, 10, 11.)

Defendants have sufficient minimum contacts with North Carolina or that they purposefully availed themselves of the privilege of conducting activities in this forum.

32. Personal jurisdiction is an individualized inquiry, requiring a showing that each Defendant has the necessary contacts with the forum. Yet a considerable number of the State's allegations refer to "Defendants" as a group rather than to any individual. The State broadly alleges that "Defendants were actively and personally involved in the day-to-day operations and decision-making at JUUL" and are therefore responsible for "all decisions, actions, and omissions stated" in the complaint. (Compl. ¶ 42.) Later, it alleges that, "by mid-2015, all Defendants were intimately involved in the planning and execution of JUUL's marketing activities that promoted JUUL products in ways Defendants knew would stoke their popularity among young people and teens." (Compl. ¶ 84.) Dozens of similarly generalized allegations appear throughout the complaint. (*See, e.g.*, Compl. ¶¶ 85, 92, 93, 95, 97, 111, 114, 117, 119, 130, 132, 147, 151, 154–56, 161, 162, 165, 170, 173, 177, 184, 185, 190, 198, 200, 202, 211–15, 221.)

33. In fact, three pillars of the State's claim—ineffective website safeguards, deceptive statements about nicotine potency, and false statements about FDA approval for smoking cessation—lack any allegations referring to individual conduct by any Defendant. Consider the claim that JUUL failed to use adequate age-verification measures for sales through its website. The complaint alleges generally that "Defendants created a youth-friendly method for distributing JUUL's products: internet sales, with age-verification techniques that Defendants knew to be

ineffective." (Compl. ¶ 190.) Thirty-two paragraphs describe the ineffectiveness of JUUL's website safeguards. Not one refers to any individual Defendant by name, much less alleges personal involvement with the company website, internet sales, or implementation of age-verification measures. (*See* Compl. ¶¶ 190–221.)

34. The same is true for the claim that JUUL misrepresented the nicotine potency of its e-cigarettes. According to the State, "Defendants deceived JUUL's consumers about the strength of the nicotine in JUUL's products" and "actively participated in company discussions regarding the amount of nicotine in JUUL products and approved the deceptive representations . . . ." (Compl. ¶¶ 161, 162.) Twenty-three paragraphs describe the alleged omissions and half-truths about nicotine potency in JUUL's marketing materials. Again, not one refers to any individual Defendant by name or alleges personal involvement in the marketing at issue. (*See* Compl. ¶¶ 161–83.)

35. As to the misrepresentations regarding smoking cessation, the complaint alleges that "Defendants reviewed, approved, and went forward with marketing plans that portrayed JUUL as a cessation device" without FDA approval. (Compl. ¶ 185.) At no point does the complaint allege personal conduct related to these marketing plans. Oddly, the State points to Congressional testimony by Monsees regarding smoking cessation and cites an article entitled "*Juul 'Specifically and on Purpose Not a Cessation Product' Co-Founder Says to Congress.*" (Compl. ¶ 186 & n.63.) There are no references by name to Bowen, Huh, Pritzker, or Valani at all. (*See* Compl. ¶¶ 184–89.)

36. These generalized allegations are facially deficient. They do not specify forum-related conduct by any individual Defendant and are little more than an attempt to attribute JUUL's business activities to its corporate officers and directors. Because due process does not allow a court to exercise jurisdiction over a nonresident defendant based on someone else's contacts, the United States Supreme Court has cautioned against "considering the 'defending parties' together and aggregating their forum contacts in determining whether" jurisdiction exists. *Rush v. Savchuk*, 444 U.S. 320, 331 (1980). The minimum-contacts requirement "must be met as to each defendant over whom a state court exercises jurisdiction." *Id.* at 332. And "jurisdiction over the individual officers [and directors] of a corporation cannot be predicated merely upon jurisdiction over the corporation." *Balance Dynamics Corp. v. Schmitt Indus.*, 204 F.3d 683, 698 (6th Cir. 2000) (citation and quotation marks omitted).[3]

---

[3] Federal courts routinely hold that similarly generalized allegations against corporate officials are insufficient to confer specific jurisdiction. *See, e.g.*, *Gen. Retail Servs. v. Wireless Toyz Franchise, L.L.C.*, 255 Fed. App'x 775, 793–94 (5th Cir. 2007) (unpublished) ("Contrary to General Retail's argument, it is not enough to simply rest on the use of the collective term, 'Defendants,' in the allegations."); *Leroy-Garcia v. Brave Arts Licensing*, 2013 U.S. Dist. LEXIS 109872, at *32–33 (N.D. Cal. Aug. 5, 2013) ("Numerous courts have found specific personal jurisdiction lacking where a plaintiff's allegations about individual defendants are so limited." (collecting cases)); *Johnson v. Diamond Shine, Inc.*, 890 F. Supp. 2d 763, 772–73 (W.D. Ky. 2012) ("Plaintiff has not alleged that [corporate official] personally took any action connected to Kentucky."); *Flagstar Bank FSB v. Centerpointe Fin., Inc.*, 2011 U.S. Dist. LEXIS 56257, at *11–13 (E.D. Mich. May 26, 2011) ("Plaintiff's claims only implicate Centerpointe as a corporation, and are entirely silent as to any personal involvement on Defendants' part."); *Farmer v. DirectSat USA, LLC*, 2010 U.S. Dist. LEXIS 7156, at *26 (N.D. Ill. Jan. 28, 2010) ("Again, Plaintiffs' generalized allegations referring to the Defendants collectively are insufficient to confer specific jurisdiction over each of the proposed individual defendants."); *Gagne v. State Farm Fire & Cas. Co.*, 2006 U.S. Dist. LEXIS 83822, at *8–9 (S.D. Miss. Nov. 16, 2006) ("Plaintiff's generalized allegations [concerning State Farm's corporate officers and board members] are nothing more than claims against State Farm.").

37. Moreover, even when the State points to individual conduct, it fails to show a sufficient connection between the conduct and North Carolina. The State alleges, for example, that Bowen and Monsees were responsible for developing the features of JUUL's e-cigarettes that make them attractive to youth, including a stylish, easy-to-conceal design, sweet flavors, and additives that reduce discomfort from inhaling. (*See, e.g.*, Compl. ¶¶ 59, 62, 71, 74, 75.) But the State does not allege or argue that any of this design work occurred in North Carolina. And the evidence shows that Bowen and Monsees worked primarily in California, where JUUL was based. (*See* Bowen Aff. ¶ 3; Monsees Aff. ¶¶ 2, 5.)

38. Likewise, much of the complaint centers on JUUL's national advertising and marketing practices: a party in New York City, a billboard in Times Square, ads in Vice magazine, retaining influencers as brand ambassadors, seeding products to celebrities, and viral messaging through social media. The State alleges that JUUL's board, including Defendants, reviewed and approved objectionable advertising and that Huh, Pritzker, and Valani formed an Executive Committee that directly managed JUUL and oversaw national marketing activity. (*See, e.g.*, Compl. ¶¶ 41, 42, 45–52, 92, 104–07, 136.) There are also scattered allegations that Monsees participated in the Times Square photo shoot, (*see* Compl. ¶ 99); that Bowen followed Instagram posts by "some rich east coast boarding school kids," (Compl. ¶ 118); and that Bowen, Monsees, and Valani tried to publicize an image of a famous pop star using a JUUL device, (*see* Compl. ¶ 122.)

39. Conspicuously absent are allegations of the kind of *case-related* contacts *with North Carolina* that are indispensable to personal jurisdiction. The disputed marketing did not target North Carolina—it occurred elsewhere (New York) or everywhere (social media). Nor is there any tie between JUUL's corporate decision-making and North Carolina. The State does not allege or argue that any board meetings took place in North Carolina, and the evidence confirms that none did. (*See* Monsees Aff. ¶ 7(b).) Similarly, the State does not allege or argue that the Executive Committee met in North Carolina or made decisions targeting this forum. In any event, the allegation that Huh, Pritzker, and Valani directly managed JUUL cannot be taken as true because all three deny having served in a management capacity. (*See* Huh Aff. ¶¶ 5, 10; Pritzker Aff. ¶¶ 4, 9; Valani Decl. ¶¶ 5, 10.)

40. The few allegations involving conduct within or related to North Carolina are not individualized, have been rebutted by affidavit, or are too attenuated to establish jurisdiction. Paragraph 8 of the complaint is a good example. The State alleges that "Defendants approved marketing and sales plans that specifically targeted North Carolina as part of JUUL's go-to-market strategy." (Compl. ¶ 8.) It is unclear what these North Carolina-centric marketing plans were, and nothing in the complaint goes on to explain how each Defendant contributed to them. Regardless, the allegation cannot be taken as true. All five Defendants deny having approved any JUUL marketing campaigns that specifically targeted North Carolina. (*See* Bowen Aff. ¶ 7; Monsees Aff. ¶ 7(f); Huh Aff. ¶ 16; Pritzker Aff. ¶ 15; Valani Decl. ¶ 16.)

41.     Paragraph 10 is similar.  The State alleges that JUUL, "at the direction of Defendants," targeted certain North Carolina cities for "in-store trainings," "billboards," "marketing with samples," and "a children's charity event."  (Compl. ¶ 10.)  There is no mention of personal involvement by any Defendant.  And again, Defendants deny involvement with these North Carolina-based activities.  (*See* Bowen Aff. ¶¶ 5, 7; Monsees Aff. ¶ 7(f); Huh Aff. ¶¶ 8, 16; Pritzker Aff. ¶¶ 7, 15; Valani Decl. ¶¶ 8, 16.)

42.     Paragraph 11 is as close as the State comes to alleging case-linked contact between any Defendant and North Carolina.  As alleged, JUUL, "at the direction of Defendants," established relationships with "North Carolina-based vendors and business partners" for pod filling and e-liquid development.  In addition, Bowen "made numerous visits to North Carolina in connection with" these relationships, and "Bowen and Monsees engaged in discussions regarding JUUL's North Carolina operations." (Compl. ¶ 11.)

43.     These alleged contacts fall short.  For one thing, nothing in paragraph 11 suggests involvement by Huh, Pritzker, and Valani, all of whom have offered unrebutted evidence to contradict the allegations.  Their affidavits state that they did not negotiate or conduct business with any North Carolina-based vendor, select or interact with suppliers in North Carolina, oversee relationships with any distributors or retailers in North Carolina, or travel to North Carolina to conduct JUUL's business. (*See* Huh Aff. ¶¶ 8, 9, 14, 15; Pritzker Aff. ¶¶ 7, 8, 13, 14; Valani Decl. ¶¶ 8, 9, 14, 15.)

44.    As to Bowen and Monsees, mere discussions about North Carolina hardly count as jurisdictional contacts.  Physical entry into North Carolina, on the other hand, "is certainly a relevant contact." *Walden*, 571 U.S. at 285.  Bowen admits that he came to North Carolina about half a dozen times between 2013 and 2017, including two visits to meet with e-liquid vendors. (*See* Bowen Aff. ¶ 9.)  Monsees also admits—though it is not alleged in the complaint—that he came to North Carolina more than once to address manufacturing issues. (*See* Monsees Aff. ¶ 7(e).)  But there is no apparent connection between these visits and the State's claim.  As Bowen and Monsees testify, their visits to North Carolina primarily involved manufacturing issues and did not concern or relate to the marketing practices challenged by the State. (*See* Bowen Aff. ¶ 9; Monsees Aff. ¶ 7(e).)

45.    If there is any evidence tending to contradict the affidavits, the State hasn't pointed to it.  The State cites no evidence to show that Huh, Pritzker, and Valani have had any direct contact with North Carolina at all.  Nor does it cite any evidence to show that the visits to North Carolina by Bowen and Monsees are related to the allegations of unlawful marketing that form the basis for its claim.

46.    Instead, the State argues that the trips by Bowen and Monsees support jurisdiction because all contacts with a forum count, "even ones that are not related to the claim raised." (Opp'n (Bowen) 11.)  Binding precedent from the United States Supreme Court says otherwise.  Courts may not relax the required connection between the forum and the asserted claims "if the defendant has extensive forum contacts that are unrelated to those claims." *Bristol-Myers Squibb Co. v. Superior*

*Court*, 137 S. Ct. 1773, 1781 (2017). That would amount to "a loose and spurious form of general jurisdiction. For specific jurisdiction, a defendant's general connections with the forum are not enough." *Id.* In other words, it would violate due process to exercise jurisdiction over Bowen and Monsees based on trips to North Carolina—even those made on JUUL's behalf—that are unrelated to the asserted claim. *See, e.g.*, *Am. Inst. of Intradermal Cosmetics, Inc. v. Soc'y of Permanent Cosmetic Profs.*, 2013 U.S. Dist. LEXIS 58138, at \*33–34 (C.D. Cal. Apr. 16, 2013) (concluding that directors' travel to forum on company's behalf was insufficiently related to asserted claim to support exercise of jurisdiction).

47. The State also argues that it does not have to show that Defendants targeted North Carolina. It contends that Defendants purposefully availed themselves of the privilege of conducting activities in North Carolina by reviewing and approving nationwide advertising with knowledge that the ads would appear in this forum just as they would across the country. In support, the State cites cases in which courts exercised jurisdiction over corporations—not their officers or directors—based on nationwide sales and marketing that also exploited the forum market. (*See* Opp'n (HPV) 14 (citing, *e.g.*, *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984)).)

48. The Colorado Supreme Court recently rejected an identical argument in a suit by the State of Colorado against these very individuals (excluding Huh). *See* *State ex rel. Weiser v. JUUL Lab, Inc.*, 2022 CO 46 (2022). There, the Colorado Attorney General asserted claims for deceptive trade practices based on allegations of wrongdoing that largely mirror the allegations here. *See id.* at ¶¶ 5–20. After the

trial court denied motions to dismiss for lack of personal jurisdiction, the Colorado Supreme Court reversed. It reasoned, first, that *Keeton*'s market-exploitation test is a poor fit for corporate directors: "Although courts can readily attribute factors such as sales volume, a customer base, and revenues to corporate entities, these factors are not readily attributable to individual directors." *Id.* at ¶ 43. And it was unable to find "a published decision in which a court subjected a corporate director, rather than the corporation itself, to jurisdiction under the market exploitation framework." *Id.*

49.     The more apt framework, according to the Colorado Supreme Court, is *Calder*'s effects test, which it summarized as requiring (1) intentional action (2) expressly aimed at the forum (3) with knowledge that the brunt of the injury would be felt there. *See JUUL Lab*, 2022 CO 46, ¶ 47 (citing *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 967 (10th Cir. 2022)).[4] The Court agreed with the defendants that involvement in JUUL's national business activities was insufficient: "Any actions that defendants took in relation to JUUL's nationwide marketing campaign

---

[4] Most courts have construed *Calder*—just as the Colorado Supreme Court did—to require conduct *expressly aimed* at the forum. *See, e.g.*, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) ("Exercise of jurisdiction in such circumstances 'may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.'"); *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 265 (3d Cir. 1998) (concluding that "the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum"); *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 230 (4th Cir. 2019) ("Put differently, the forum must be the 'focal point' of the conduct."); *McFadin v. Gerber*, 587 F.3d 753, 760 (5th Cir. 2009) (foreseeable injury in the state is not enough absent the direction of specific acts toward the forum); *Eighteen Seventy*, 32 F.4th at 967 (holding that failure to establish any element of effects test, including conduct expressly aimed at forum, "will doom [the] showing of purposeful direction").

were not 'expressly aimed' at Colorado." *Id.* at ¶ 60. As a result, the Court concluded that the complaint's allegations did not establish a prima facie case of jurisdiction.

50. This decision, though not binding, is highly compelling. For the reasons stated by the Colorado Supreme Court, it would make little sense to apply *Keeton*'s market-exploitation test here. JUUL may well have the kind of regular, continuous sales activity in North Carolina that renders it subject to jurisdiction. But any contacts that Defendants have with North Carolina "must be assessed individually," and "their contacts . . . are not to be judged according to [JUUL's] activities" in the forum. *Calder*, 465 U.S. at 790. Due process requires nothing less. If it were otherwise, "directors of a corporation that does business nationwide would potentially be subject to personal jurisdiction in every state, regardless of their lack of connection to a particular forum." *JUUL Lab*, 2022 CO 46, ¶ 67.

51. *Calder*'s effects test is far more suited to this case's facts. Yet the State does not cite *Calder*, much less attempt to show that Defendants expressly aimed conduct at North Carolina or that North Carolina is the focal point of their activities. Indeed, the evidence is one-sided in Defendants' favor. Huh, Pritzker, and Valani had no advertising, sales, or other marketing contact with North Carolina at all. Likewise, Bowen and Monsees had no advertising and sales activity targeting North Carolina, and their travel to North Carolina on JUUL's behalf did not involve the marketing practices that form the basis of the State's claim. The State has not cited any contrary evidence. Thus, the Court concludes that the evidence is insufficient to satisfy

*Calder*'s effects test and its requirement to show conduct expressly aimed at North Carolina.

52. In sum, the State has failed to carry its burden to show that Defendants have sufficient minimum contacts with North Carolina and that they purposefully availed themselves of the privilege of conducting activities in this forum. The Court therefore concludes that it may not exercise personal jurisdiction over them.

## C. Jurisdictional Discovery

53. In each of its opposition briefs, the State tacks on a footnote requesting jurisdictional discovery. Whether to grant jurisdictional discovery is within the Court's discretion. *See, e.g.*, *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *12 (N.C. Super. Ct. Oct. 2, 2017).

54. In its discretion, the Court denies the State's barebones request. Its footnotes contain a single sentence, lacking any citation to legal authority or any explanation of what discovery the State would seek if allowed. (*See* Opp'n (Bowen) 17 n.6; Opp'n (Monsees) 16 n.6; Opp'n (HPV) 15 n.6.) Defendants have specifically denied the State's jurisdictional allegations, the State has made no effort to cite or explain the evidence currently in the record, and the State offers no forecast of what it believes discovery would show. Moreover, the State has already obtained a significant amount of discovery during its earlier lawsuit against JUUL and is therefore in a better position to assess jurisdictional facts than many plaintiffs. There is no basis to allow jurisdictional discovery. *See, e.g.*, *Carefirst of Md.*, 334 F.3d at

403 (affirming denial of jurisdictional discovery when plaintiff made no "concrete proffer" and gave no reason to believe discovery would "alter" the analysis).

## IV.
## CONCLUSION

55. For all these reasons, the Court **GRANTS** Defendants' motions to dismiss for lack of personal jurisdiction. The complaint is **DISMISSED** without prejudice in its entirety, and the Court **DENIES** all other relief as moot.

**SO ORDERED**, this the 27th day of October, 2022.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases